John **FLYNN** et al., Plaintiffs,

v.

**THIBODEAUX MASONRY, INC., Thibodeaux Masonry, and, Thomas Thibodeaux, Defendants.**

No. CIV.A.02–0710 (RMU).

United States District Court, District of Columbia.

March 30, 2004.

---

Ira R. Mitzner, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Plaintiffs.

Thomas Thibodeaux, Baton Rouge, LA, for Defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT THIBODEAUX MASONRY, INC. AND GRANTING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS THIBODEAUX MASONRY AND THOMAS THIBODEAUX

### I. INTRODUCTION

This matter comes before the court on the plaintiffs' motions for default judgment and for summary judgment. The plaintiffs, fiduciaries and trustees of the Bricklayers & Trowel Trades International Pension Fund (the "IPF"),[1] bring suit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, against the *pro se* defendants, Thomas Thibodeaux ("Thibodeaux"), Thibodeaux Masonry, and Thibodeaux Masonry, Inc. ("TMI") (collectively "the defendants") for delinquent pension contributions. Because TMI has not retained counsel, the court enters default judgment against TMI. Because the plaintiffs have identified an ab-

---

1. The IPF is an "employee benefit plan" within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multi-employer plan" within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37). Compl. ¶ 3 (citing 29 U.S.C. § 1002(3), (37)).

sence of evidence proffered by Thibodeaux and Thibodeaux Masonry regarding their delinquent contributions, the court grants summary judgment to the plaintiffs with regard to those defendants.

## II.  BACKGROUND

### A.  Factual Background

Thomas Thibodeaux and his wife Lura have run a masonry business in Louisiana since January of 1998. Pls.' Statement of Undisputed Material Facts ("SUF") ¶ 11.[2] Initially, the Thibodeauxs operated their masonry business through "Thibodeaux Masonry," a sole proprietorship. *Id.* On May 1, 1998, Thomas Thibodeaux, acting as president of Thibodeaux Masonry, signed a collective bargaining agreement ("CBA") with the International Union of Bricklayers & Allied Craftworkers ("the Union").[3] *Id.* ¶ 12. The CBA required Thibodeaux and Thibodeaux Masonry to make payments on behalf of his employees to the IPF, the Bricklayers and Allied Craftworkers ("BAC"), the International Health Fund ("IHF"), and the International Masonry Institute ("IMI"). *Id.* ¶¶ 13–14.[4] On May 4, 1999, Thibodeaux merged Thibodeaux Masonry into TMI. *Id.* ¶ 16. On May 1, 2000, Thibodeaux, acting as president of TMI, signed a second CBA on behalf of TMI that imposed the same payment requirements on TMI as the first CBA imposed on Thibodeaux Masonry. *Id.* ¶ 17. At some point after Thibodeaux had incorporated TMI, the plaintiffs requested an audit of Thibodeaux Masonry and TMI, which the payroll auditing firm of Guenther, Guenther & Gillane performed. *Id.* ¶¶ 34–35. The plaintiffs' allege that the audit and subsequent calcula-

tions revealed an outstanding delinquency of $68,945.18. Pls.' Mot. at 9; Stupar Supplemental Decl. ¶ 3.

### B.  Procedural Background

The plaintiffs filed their complaint on April 15, 2002. The defendants filed a motion to transfer venue on May 28, 2002. On October 28, 2002, the court denied the defendants' motion to transfer venue. Order dated October 28, 2002. Because it appeared that corporate defendants were proceeding *pro se*, on May 13, 2003, the court ordered the *pro se* corporate defendants to retain counsel, specifically warning that failure to comply could result in the court imposing default judgment as a sanction for non-compliance. Order dated May 13, 2003. On June 9, 2003, Thibodeaux responded to the court's order stating that TMI would not retain counsel. Defs.' Resp. to Order. On June 18, 2003, the plaintiffs filed a motion for default judgment against Thibodeaux Masonry and TMI. In the defendants' opposition to the motion for default judgment, the defendants clarified that only TMI was a corporation, but reiterated that TMI would not retain counsel. Defs.' Opp'n to Pls.' Mot. For Default J. ("Defs.' Default J. Opp'n") at 1. On July 11, 2003, the plaintiffs filed a motion for summary judgment against the defendants, recognizing that the motion would be moot if the court granted default judgement against either Thibodeaux Masonry or TMI. Pls.' Mot. For Summ. J. ("Pls.' Mot.") at 2 n. 1. Given the defendants' *pro se* status, the court issued an order directing the defendants to respond to the plaintiffs' motion for summary judgment and providing notice of the

---

**2.**  The defendants did not file their own statement of undisputed material facts.

**3.**  The CBA was created to provide for, *inter alia*, a peaceful means for settlement of lockouts and strikes, the promotion of safe working conditions, establishment of wages, hours

and conditions of employment, and payment of funds to various health, welfare and pension funds.  Stupar Decl. Ex. 1.

**4.**  The IPF is authorized to effect collections on behalf of the IMI, IHF and the BAC. Pls.' SUF ¶ 8.

consequences of a failure to file an opposition. Order dated Dec. 17, 2003.

Thus, the two motions currently before the court are: 1) the plaintiffs' motion for default judgment against Thibodeaux Masonry and TMI and 2) the plaintiffs' motion for summary judgment against Thibodeaux Masonry, TMI, and Thomas Thibodeaux. The court now turns to those motions.

## III. ANALYSIS

### A. Legal Standard for Entry of Default Judgment For Failure to Comply With a Court Order Pursuant to Rules 37(b)(2)(C) and 16(f)

■ Under the Federal Rules of Civil Procedure, a court may impose sanctions for failure to comply with various court orders. Under Rule 37(b)(2)(C), if a party "fails to obey an order to provide or permit discovery," the court may render judgment by default against the disobedient party. FED.R.CIV.P. 37(b)(2)(C). Under Rule 16(f), if a party "fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference," the court may, in its discretion, levy various sanctions against the disobedient party, including a Rule 37 judgment by default. FED. R.CIV.P. 16(f). Sanctions are integral to the operation of the judicial system. *Bristol Petroleum Corp. v. Harris,* 901 F.2d 165, 167 (D.C.Cir.1990). As the D.C. Circuit has stated, sanctions "have been entrusted to the district courts to enable district judges to discharge efficiently their front-line responsibility for operating the judicial system." *Id.* (citing Rules 37 and 11 in upholding dismissal for a plaintiff's failure to appear at a status conference). The most severe sanctions "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who

might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (upholding the trial court's dismissal under Rule 37 for violations of pretrial discovery orders).

■ That said, a default judgment is a drastic sanction. Generally, the imposition of less severe sanctions, such as the award of attorney's fees, may be "sufficiently effective in alerting an irresponsible litigant to the seriousness of his or her neglect, protecting the interests of the other litigants in the case, and vindicating the integrity of the court." *C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co.,* 726 F.2d 1202, 1209 (7th Cir.1984). In those cases where a court orders a dismissal or enters a default judgment, the disobedient party typically has engaged in a pattern of noncompliance with court orders so that no lesser sanction is warranted. *Secs. & Exch. Comm'n v. Hollywood Trenz, Inc.,* 202 F.R.D. 3, 7 (D.D.C.2001) (citing 6A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, FED. PRAC. & PROC., § 1531). Accordingly, courts have granted default judgment when parties have not complied with court orders or have missed hearings. *Eagle Assocs. v. Bank of Montreal,* 926 F.2d 1305, 1310 (2d Cir.1991) (upholding entry of default judgment where a defendant partnership ignored a court order directing that it retain counsel).

### B. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at

675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### C. The Court Grants the Plaintiffs' Motion for Default Judgment Against TMI [5]

As noted, the court ordered TMI to retain counsel by June 7, 2003, specifically warning that the court could impose default judgment as a sanction for non-compliance. Order dated May 13, 2003. "It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel." *Rowland v. Calif. Dept. of Corrections,* 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993); *accord Harris,* 901 F.2d at 166 n. 1 (noting that corporations may not appear *pro se* ). The defendants state that TMI cannot retain counsel "due to lack of resources," and that a default judgment would therefore prejudice it. Defs.' Default J. Opp'n at 1. This reasoning, however, does not persuade the court to deviate from the long line of precedent requiring corporate defendants to have representation by counsel in federal courts. Indeed, the defendants cite no case law in support of their argument. *See generally* Defs.' Response to Ct. Order. Because TMI has deliberately refused to retain counsel despite this court's unambiguous warning and order, the court grants the plaintiffs' motion for default judgment against TMI pursuant to Rules 37(b)(2)(C) and 16(f). *Eagle,* 926 F.2d at 1310; *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 918 (3d Cir.1992) (noting that default judgment is proper when a party fails to comply with

---

5. In the defendants opposition to default judgment, the defendants clarified that Thibodeaux Masonry is not a corporation. Defs.' Default J. Opp'n at 1. As a result, the court grants the motion for default judgment with respect to TMI and reserves Thibodeaux Masonry for the plaintiffs' motion for summary judgment.

an unambiguous order to obtain counsel); *Steigerwald v. Bradley*, 2001 WL 357306, at \*1–2 (D.Md. Apr.10, 2001) (granting default judgment after the defendant corporation defied a court order to obtain counsel on the grounds that it could not afford counsel).

### D. The Court Grants the Plaintiffs' Motion for Summary Judgment Against Thibodeaux and Thibodeaux Masonry

The plaintiffs bring suit under section 515 of ERISA, which obligates employers to make contributions required under a collective bargaining agreement "in accordance with the terms and conditions of such plan[.]" 29 U.S.C. § 1145. Under section 502(g)(2) of ERISA, if the court enters a judgment in favor of the plaintiffs, the court must · award the plaintiffs the unpaid contributions, interest, attorney's fees and costs, and any other appropriate awards. 29 U.S.C. § 1132(g)(2).

#### 1. The Defendants Are Delinquent in Their Payments

■ The plaintiffs assert that the defendants' obligations under the two CBAs that Thibodeaux signed and their performance of covered work, the defendants failed to fully report hours and make the required contributions to the IPF, BAC, IHF, and IMI. Pls.' Mot. at 5. In support of these assertions, the plaintiffs proffer the declarations the executive director of the IPF who stated that the independent audit revealed that the defendants are delinquent in their payments in the amount of $38,672.54. Stupar Supplemental Decl. ¶ 6. The plaintiffs assert that in addition to the delinquent payments, the defendants owe interest, statutory interest, audit fees, court costs and process server's fees for a total amount of $68,945.18 plus attorney's

fees and costs. *Id.* The plaintiffs' also provide detailed documentary evidence consisting of the independent audit report, the plaintiffs' recap,[6] the CBAs and various employment records. *See*, Pls.' Mot. Exs. 1–6, A–F; Supplemental Exs. 1–2.

In response, the defendants assert that "[a]ll arrearages as to the Defendant, Thomas Thibodeaux or Thomas Thibodeaux d/b/a/ Thibodeaux Masonry have been paid and satisfied." Defs.' Opp'n to Summ. J. ("Defs.' Opp'n") at 2. With regard to TMI, the defendants state that the total amount that TMI owes "could only aggregate $10,630.63." *Id.* at 2. In addition, the defendants assert that the second CBA that TMI entered into superseded the first CBA. *Id.* at 1. Thus, the defendants argue, only TMI would be responsible for any liability that the defendants incurred after entry of the second CBA. *Id.* at 2. As evidence to support its contentions, the defendants' submit the affidavits of Thomas and Lura Thibodeaux, TMI's articles of incorporation, the signatory page of the second CBA, three charts of unknown origin that list unreported hours and check amounts and a photocopy of the front of a check. Defs.' Opp'n Attachs. 1–2, Exs. 1–2; Defs.' Supplemental Attach. 1–4.

To begin, the court notes that the defendants have not put into context, or otherwise explained several of their key exhibits. For instance, the defendants provide three charts that purport to show Thibodeaux's (1) payment history, (2) unreported hours according to the independent audit, and (3) "corrected" unreported hours. Defs.' Supplemental Attach. 1–3. The defendants have given no indication as to the charts' origin or source. For all the court knows, the charts may contain inaccurate

---

**6.** A recap is a report that the plaintiffs prepare following the receipt of an audit that gives the employer credit for any payments made or new information learned after the conclusion of the audit. Stupar Supplemental Decl. ¶ 4.

or speculative information regarding the defendants' payments and unreported hours. Accordingly, the court concludes that the defendants' unsupported documentary evidence is not reliably probative of the total outstanding delinquency. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

If, out of an abundance of caution, the court accepted the defendants' exhibits as reliably probative evidence, the exhibits seem only to confirm the facts not in dispute. The plaintiffs' concede that the defendants paid $11,931.34 to the plaintiffs pursuant to the settlement of a previous lawsuit and the total amount that the plaintiffs allege is due reflects that payment.[7] Stupar Supplemental Decl. ¶¶ 5, 6. The defendants' supplemental attachment 1 appears to be a chart reflecting settlement payments in the amount of $11,458.89. Defs.' Supplemental Attach. 1. Thus, it appears that both the plaintiffs and defendants agree that the defendants have already paid a settlement of over $11,456.89 and that the plaintiffs have applied that payment to the alleged current outstanding balance. Stupar Supplemental Decl. ¶ 5. The court reiterates, however, that the lack of any context or explanation of what the defendants' attachments represent makes the task of discerning what proposition the attachments are offered to support difficult, if not impossible.

Putting to one side the conceded payment, the plaintiffs assert that the defendants still owe them $68,945.18. Stupar Supplemental Decl. ¶ 6. As noted, in support of this proposition, the plaintiffs offer the declaration of the IPF's executive director, as well as the documentary evidence of the independent audit report. To rebut the plaintiffs' allegations, the defendants merely assert that Thibodeaux and Thibodeaux Masonry have paid all sums

due to the plaintiffs and that TMI only owes the plaintiffs $10,603.63. Defs.' Opp'n at 2. The defendants also restate this assertion in affidavits from Thomas and Lura Thibodeaux Defs.' Opp'n Attach 1–2. Finally, the defendants assert that the second CBA that Thibodeaux signed on behalf of TMI requires the plaintiffs to look only to TMI for payment. Defs.' Opp'n. at 3.

Essentially, the defendants support all of their arguments against summary judgment exclusively by self-serving, conclusory statements from Thomas and Lura Thibodeaux. As to the plaintiff's assertion, that the second CBA provides that TMI is the only party that could be liable for delinquent payments, the court's review of the second CBA does not reveal any such intent. In fact, the CBAs appear to be identical, except for the persons who signed them. *Compare* Stupar Decl. Ex. 1 *with* Ex. 3. Further, the defendants produce only the signatory page of the second CBA. Defs.' Opp'n Ex. 2. This signatory page, however, does not demonstrate anything regarding the intent of the parties to supersede the first CBA. The court is neither required to, nor does it for any other reason, accept these conclusory statements as true. *Greene,* 164 F.3d at 675. In sum, because of the complete absence of any reliably probative evidence or proof proffered by the defendants, there exists no genuine issue of material fact and the court grants summary judgment to the plaintiffs. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## 2. The Court Concludes that Thibodeaux Masonry and TMI Are Alter–Egos

Now that the court has established liability, the court must determine which par-

---

7. In fact, the plaintiffs' calculations appear to credit the defendants with $472.95 more than the defendants claim they paid. Stupar Supplemental Decl. ¶ 5.

ty is liable for damages. The defendants argue that because Thibodeaux incorporated his business on May 4, 1999, the plaintiffs cannot recover damages from him or Thibodeaux Masonry for any delinquent payments after that date. Defs.' Mot. at 1–3. In response, the plaintiffs assert that the defendants are merely alter-egos of each other and that the court should hold each of them jointly and severally liable for all damages. Pls.' Mot. at 10–11. Because Thibodeaux Masonry and TMI have the same ownership, management, business purpose and operations, the court concludes that Thibodeaux Masonry and TMI are, for the purposes of this suit, alter egos and that both are liable for damages.

### a. Legal Standard for Determining Alter–Egos in the ERISA Context

██ In the ERISA context, alter-ego liability enables ERISA trustees to "recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." *Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C.Cir.2004). Stated differently, the purpose of alter-ego liability is "to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making a mere technical change in the structure or identity of the employing entity ... without making any substantial change in its ownership or management." *Mass. Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir.1998) (internal citations omitted).

██ In order to determine whether two businesses are alter egos, the court "evaluate[s] the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers." *R.C. Tile*, 353 F.3d at 958. In this analysis, "[n]o single factor is controlling and all need not be present to

support a finding of alter ego status." *Belmont Concrete*, 139 F.3d at 308.

### b. Thibodeaux Masonry and TMI Have the Same Ownership, Management, Business Purpose, Address and Employees

The question before the court is whether TMI is the alter ego of Thibodeaux Masonry. If so, TMI is bound by both of the CBAs relevant to this case. *R.C. Tile*, 353 F.3d at 959; *Belmont Concrete*, 139 F.3d at 309; *Cent. States, S.E. & S.W. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir.1990) (holding that an alter ego of signatory employer is "obligated to honor the pension contribution terms of the [CBA]"). As an initial matter, the court notes that the defendants do not advance any argument or contradict any of the plaintiffs' assertions regarding alter ego liability or status. Accordingly, the court may treat the plaintiffs' assertions as conceded. *Buggs v. Powell*, 293 F.Supp.2d 135, 141 (D.D.C.2003); *Stephenson v. Cox*, 223 F.Supp.2d 119, 121 (D.D.C.2002). Out of an abundance of caution, however, the court goes on to analyze the merits of the plaintiffs' argument.

██ The uncontroverted evidence is overwhelming that Thibodeaux Masonry and TMI are alter egos. Thibodeaux was the president of both companies. Pls.' SUF ¶ 27; Answer ¶ 8; Pls.' Mot. Ex. C. Lura Thibodeaux was the secretary and treasurer of both companies. Pls.' SUF 28; Pls.' Mot. Exs. C, D. Thibodeaux Masonry and TMI were in the same line of business and shared the same address and phone number. Pls.' SUF ¶¶ 23, 33; Stupar Decl. Exs. 1, 3. Thibodeaux Masonry and TMI shared the same employees. Pls.' SUF ¶ 32; Stupar Decl. Exs. 4–6. Finally, Thibodeaux himself admitted that subsequent to May 4, 1999, "Thomas Thibodeaux and Thibodeaux Masonry no long-

er functioned as individual entities, but were merged into and became Thibodeaux Masonry, Inc." Answer ¶ 6. Thus, the court concludes that it is clear that Thibodeaux Masonry and TMI are alter egos. *R.C. Tile*, 353 F.3d at 959 (holding that companies that had essentially the same ownership, management, business purpose, operations and customers were alter egos). Therefore each is liable for the other's delinquent contributions. *Id.*

### 3. Thibodeaux Is Personally Liable For the Debts of Thibodeaux Masonry and TMI

█ Finally, the plaintiffs ask the court to hold that Thomas Thibodeaux himself personally liable for any damages that the court awards. Pls.' Mot. at 16. In support of this argument, the plaintiffs contend that "[t]o allow defendants such as these to hide behind mere changes in the formal name of their family business would 'defeat ERISA's purposes and work a clear injustice.'" *Id.* at 17 (quoting *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir. 1986)). The defendants stand silent on the issue of Thibodeaux's individual liability. Because there is a unity of interest and ownership such that separate personalities of Thibodeaux and TMI do not exist, and an inequitable result would follow if TMI's actions were treated as those of the corporation alone, the court pierces TMI's corporate veil and concludes that Thibodeaux is personally liable for all damages.

### a. Legal Standard for Piercing the Corporate Veil

█ The D.C. Circuit instructs that "[w]hen particular circumstances merit . . . courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for 'corporate' obligations." *Labadie Coal Co., v. Black*, 672 F.2d 92, 96 (D.C.Cir.1982); *see also United States v. Pena*, 731 F.2d 8, 12 (D.C.Cir.1984) (holding that courts should apply federal common law when a federal interest is implicated by the decision of whether to pierce the corporate veil). When a court looks beyond the corporate form to attach liability to an individual shareholder, the court is said to have "pierced the corporate veil." *Id.* To determine if piercing the corporate veil is warranted, the court applies a two-prong test, asking: (1) whether there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) whether, if the acts are treated as those of the corporation alone, an inequitable result will follow. *Id.*

### b. There is a Unity of Interest and Ownership Such That Separate Personalities of Thibodeaux and TMI Do Not Exist

█ To assess the first prong, the court looks to several factors. These are (1) the nature of the corporate ownership and control; (2) whether the corporation has maintained minutes or adequate corporate records; (3) whether the corporation has maintained corporate formalities necessary for issuance or subscription to stock, such as an independent board of directors' formal approval of the stock issue; (4) whether there is a commingling of funds and other assets of the corporation; (5) whether there is a diversion of the corporation's funds or assets to non-corporate uses such as the personal uses of the corporation's shareholders; and (6) whether the corporation and its individual shareholders use the same office or business location. *Id.* at 97–99. "[I]t is clearly not necessary that all of these factors be present in a given case to justify piercing the veil." *Id.* at 97. In the instant case, all of the present factors weigh in favor of piercing the corporate veil.

### i. Thomas Thibodeaux Controlled and Dominated TMI

With regard to the first factor, the D.C. Circuit has stated that "a corporate form may be ignored whenever an individual so dominates his organizations 'as in reality to dominate its separate personality.'" *Id.* at 97 (quoting *Quinn v. Butz,* 510 F.2d 743, 758 (D.C.Cir.1975)). In the instant case, Thibodeaux was the president and one of the only two shareholders of TMI. Pls.' SUF ¶ 27; Answer ¶ 8; Pls.' Mot. Ex. C.; Defs.' Opp'n to Default. J. at 2. According to TMI's minutes, Thibodeaux was authorized, in his sole and absolute discretion to, *inter alia,* buy and sell all classes of property, resolve any dispute that arose between TMI and any other party, borrow sums of money upon such terms, conditions and, interest rates as he deemed advisable, secure indebtedness of TMI by any type of security device he deemed advisable and to manage the affairs of the corporation generally and without limitation. Pls.' Mot. Ex. C. Under these facts, it is clear that Thibodeaux controlled TMI "as in reality to dominate its separate personality." *Labadie Coal,* 672 F.2d at 97. Accordingly, the nature of the corporate ownership and control weighs in favor of piercing the corporate veil. *Id.*

### ii. TMI Failed to Maintain Adequate Corporate Records

"The failure of [a] defendant to produce any corporate records, such as minutes, bylaws, articles of incorporation, lists of directors and so on, creates a strong inference that these records do not exist." *Id.* at 97. The defendants produced the articles of incorporation for TMI, and the plaintiffs produced as one of their exhibits the minutes of one meeting that took place several days prior to the filing of the articles of incorporation. Defs.' Opp'n Ex. 1; Pls.' Mot. Ex. C. The record, however, does not indicate any fur-

ther corporate documentation. If TMI was, in fact, a separate and distinct entity, one would expect appropriate records to be kept. *Labadie Coal,* 672 F.2d at 97. On the other hand, if TMI was merely a shell for Thibodeaux's own family business, "in all practicality, such records would not be as important and therefore might not be carefully maintained." *Id.* Thus, the absence of minutes subsequent to incorporation, bylaws, and lists of directors suggests that TMI was not a separate, distinct entity from Thibodeaux himself. *Id.* In addition, "there is no evidence that directors, whoever they are, have ever played a meaningful role in [the corporation's] activities." *Id.* It appears from the minutes of the meeting held prior to incorporation that Thibodeaux alone controlled TMI and made all corporate decisions. Pls.' Mot. Ex. C. Thus, the court concludes that the failure to maintain adequate corporate records weighs in favor of piercing the corporate veil.

### iii. TMI Failed to Maintain Corporate Formalities Necessary for Issuance or Subscription to Stock

The record does not indicate that TMI maintained corporate formalities necessary for issuance of or subscription to stock. For instance, there is no evidence of a formal approval of a stock issue by an independent board of directors. The only information in the record relating to the stock of TMI is that Thomas and Lura Thibodeaux are the sole shareholders of TMI. Defs.' Default. J. Opp'n at 2. This type of behavior regarding issuance or subscription to stock weighs in favor of piercing the corporate veil. *Labadie Coal,* 672 F.2d at 98.

### iv. Thomas Thibodeaux and TMI Utilized the Same Business Location

Another factor that bears on the relationship between Thibodeaux and TMI

is the business location of the corporation and its individual shareholders. *Id.* at 99. In the instant case, the plaintiffs produced a check from Thomas Thibodeaux dated April 8, 1999, which was prior to the incorporation of TMI, listing his address as 525 Jean Lafitte Drive in Baton Rouge, Louisiana. Pls.' Mot. Ex. E. The plaintiffs have also produced a check from TMI dated July 22, 1999, which lists TMI's address to be the same. *Id.* Accordingly, it appears that Thibodeaux and TMI shared the same location. The use of the same business location by the corporation and its individual shareholder militates in favor of piercing the corporate veil. *Labadie Coal,* 672 F.2d at 99.

### c. An Inequitable Result Would Follow if the Court Does Not Pierce TMI's Corporate Veil

Under the second prong, the court must determine if an inequitable result would follow from treating the corporation's actions as those of the corporation alone. *Labadie Coal,* 672 F.2d at 96. In the instant case, allowing Thibodeaux to escape TMI's incurred liability would undermine "basic fairness to parties dealing with the corporation." *Id.* at 96. As another member of this court has explained, "ERISA was enacted, in part, to prevent employers from avoiding financial obligations to their employee benefit plans. To permit the corporate form to be raised selectively to shield an individual from this liability would run directly counter to the underlying policy of ERISA[.]" *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.,* 1991 WL 511071, at *5 (D.D.C. Oct.18, 1991).

TMI has ceased business operations and no longer exists. Pls.' Mot. Ex. B. Further, the court has already concluded that TMI owes the fund for delinquent contributions. Therefore, the court concludes that an inequitable result would follow if the court does not pierce the corporate form of TMI in order to place liability on Thibodeaux. *Labadie Coal,* 672 F.2d at 99.

### 4. The Court Concludes That Breach of Contract Is Not an Applicable Defense

As a final matter, the defendants allude to a breach of contract by an alleged failure of the Union to provide "competent and qualified employees." Defs.' Opp. at 1. Although it is unclear from the defendants' opposition whether they are relying on this fact to defeat summary judgment, giving them every benefit of the doubt, the court will construe this allegation as asserting a defense to the plaintiffs' claim for damages. This asserted defense, however, provides no escape for the defendants. The Supreme Court has held that a union's breach of a CBA does not void an employer's duty to make contributions to a union welfare fund. *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 470–71, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). Furthermore, "the Funds are not identical to the unions; Congress intended to protect the Funds' financial stability by limiting the scope of issues litigable when they seek to recover employers' contributions." *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.,* 157 F.3d 404, 408 (5th Cir.1998). Courts, however, have recognized three possible defenses an employer may raise to delinquent-contribution suits brought against it. *See, e.g., Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992). Those defenses are:

(1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio,* as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement; and (3) the employees have voted to decertify the union as

its bargaining representative, thus prospectively voiding the union's collective bargaining agreement.

*Id.* at 1505 (internal citations omitted); *accord Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co., Inc.*, 288 F.Supp.2d 22, 30 n. 5 (D.D.C.2003) (same). The defendants fail to assert any of the three contract defenses. Therefore, the court concludes that the plaintiffs' summary judgment motion withstands the defendants' allusion to a contract breach by the plaintiff.

### E. Damages

The plaintiffs have calculated total amount of delinquent contributions as $38,672.54. Stupar Supplemental Decl. ¶ 6. According to the plaintiffs, in addition to the delinquent contributions, the defendants owe interest, audit fees, court costs and process server fees. *Id.* Thus, the plaintiffs calculate the total amount the defendants owe at $68,945.18. *Id.* Finally, pursuant to ERISA section 502(g)(2)(D), the plaintiffs ask for reasonable attorney's fees and costs. *Id.*

The court notes that one issue regarding damages remains unclear. The plaintiffs state that the defendants signed the first CBA on May 1, 1998. Pls.' SUF ¶ 12. In explaining the dates covered by its audit, however, the plaintiffs state that the audit revealed delinquent contributions due for January 1998 through July 2000 and January 2001 through September 2001. Pls.' Mot. at 5. It is not apparent to the court why the defendants began to incur liability for delinquent payments in January 1998 when the defendants did not sign the first CBA until May 1998. Accordingly, the plaintiffs must file a motion for entry of final judgment specifying the basis for, and itemizing all requests for damages, including attorney's fees and costs.

### IV. CONCLUSION

For the foregoing reasons, the court grants the plaintiffs' motions for default judgment and for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 30th day of March, 2004.