Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Decided January 9, 2004

No. 02-7091

JOHN FLYNN, JOHN T. JOYCE, LOUIS WEIR, FRANK STUPAR,
JAMES BOLAND, GEORGE HARBISON, DOMINIC SPANO, PAUL SONGER,
CHARLES VELARDO, EUGENE GEORGE, JOHN WALLNER,
WALTER KARDY, DAN SCHIFFER, AND JOSEPH SPERANZA, JR.,
AS TRUSTEES OF, AND ON BEHALF OF THE
BRICKLAYERS AND TROWEL TRADES INTERNATIONAL PENSION FUND,
APPELLEES

v.

R.C. TILE, R.C. CONSTRUCTION, RICHARD C. FLORES, AND
PRISCILLA JEAN FLORES,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 99cv02044 (EGS))

*Ira R. Mitzner* filed a brief for appellees.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard C. Flores*, individually and doing business as R.C. Construction, and *Priscilla Jean Flores*, individually and doing business as R.C. Tile, filed a brief for appellants *pro se*.

Before: GINSBURG, *Chief Judge*, and SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Richard Flores, individually and doing business as R.C. Construction, and Priscilla Flores, individually and doing business as R.C. Tile, appeal the judgment of the district court in favor of the Trustees of the Bricklayers and Trowel Trades International Pension Fund upon the Trustees' claim under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, for delinquent pension contributions. The appellants contend the district court overlooked genuine issues of material fact and applied incorrect legal standards in concluding R.C. Tile was the alter ego of R.C. Construction and liable for its delinquent pension contributions. We affirm the judgment.*

## I.  Background

The three Flores brothers – Joseph, Richard, and Jesse – do tile work on public projects in southern California. Joseph Flores manages all operations of the family's tile installation businesses; his wife, Priscilla Flores, oversees the finances and acts as office manager for the family's businesses. Richard and Jesse Flores set tile and do not have management responsibilities.

Over the past thirty years the Flores family has owned and operated several tile businesses in southern California. Joseph Flores owned and operated Majestic Tile from 1970 to 1995; Richard Flores worked for him. Majestic Tile closed in 1995 after Joseph Flores encountered problems with the IRS owing to Majestic's failure to remit payroll taxes. This case

---

*This case was considered upon the record from the district court and upon the briefs submitted by parties. *See* FED. R. APP. P. 34(a)(2);  D.C. CIR. RULE 34(j).

concerns three of the family's businesses that began operations after Majestic was closed.

In 1995 Richard started a business known as R.C. Construction. Although nominally the owner, Richard had little knowledge about or involvement with the management and finances of R.C. Construction. Richard received wages for his work as a tile setter but received no share of the profits. Joseph Flores, who referred to himself as the "operations manager" of R.C. Construction, estimated, bid, and negotiated R.C. Construction's tile setting contracts as he had Majestic's before. Priscilla was in charge of R.C. Construction's finances, as she had been of Majestic's.

In 1996 R.C. Construction entered into a collective bargaining agreement (CBA) with the local affiliate of the International Union of Bricklayers and Allied Craftsmen. R.C. Construction thereby agreed to make contributions to the Bricklayers and Trowel Trades International Pension Fund "for each hour worked by all workmen covered by this agreement" – defined to include all tile setters employed by R.C. Construction – until such time as the company gave effective notice of its withdrawal from the CBA. Although R.C. Construction ceased making payments to the Fund in December 1997, and ceased operating in January 1998, it did not then provide the Fund with a notice of withdrawal from the CBA.

Shortly after R.C. Construction ceased operations, Jesse Flores started R.C. Tile. Although Jesse was listed as the owner, he did not have any involvement in the management of the firm; he worked solely as a tile setter. Joseph, who again styled himself the "operations manager," stated in his deposition that "R.C. Tile was my company." Priscilla served R.C. Tile, as she had R.C. Construction, as the office manager and bookkeeper. Although there was no written contract between the two companies, R.C. Tile assumed R.C. Construction's tile setting sub-contracts and completed jobs R.C. Construction had begun. R.C. Tile did not, however, become a signatory to the CBA or contribute to the Fund.

In 1998 Jesse Flores transferred the assets of R.C. Tile to Priscilla Flores; there was no written contract of sale and apparently no consideration. Priscilla continued to do business under the R.C. Tile name and each member of the Flores family continued to perform his or her job at R.C. Tile.

When R.C. Construction had not made any payments to the Fund for more than a year, the Trustees of the Fund made unavailing demands upon both R.C. Construction and R.C. Tile. Richard and Priscilla Flores respectively notified the Trustees that R.C. Construction and R.C. Tile (although not a signatory) were withdrawing from the CBA.* The Trustees then sued R.C. Construction, R.C. Tile, and Richard and Priscilla Flores under, 29 U.S.C. §§ 1132(g)(2) and 1145 to recover the delinquent pension fund payments.

The district court granted the Trustees' motion for summary judgment. The court concluded from the undisputed material facts that "R.C. Construction and the two R.C. Tile companies are alter egos" and that "it is in the interest of justice to hold that these three successive companies are alter egos." The appellants moved for reconsideration, which the district court denied, and they now appeal to this court.

## II.  Analysis

We review the district court's grant of summary judgment *de novo*. *See Workman v. United Methodist Comm. on Relief of the Gen. Bd. of Global Ministries*, 320 F.3d 259, 262 (D.C. Cir. 2003). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The appellants present three arguments for reversing the judgment of the district court: First, the court failed to

---

* The notice of withdrawal was dated May 28, 1999. Under the CBA, however, a notice of withdrawal delivered within the 60 days prior to June 1 was not effective until June 1 of the following year.

consider the Declaration of Joseph Flores, which contained material facts in dispute. Second, the court both ignored other facts material to whether R.C. Construction and R.C. Tile were alter egos and applied incorrect legal standards for determining whether an entity is an alter ego under the ERISA. Third, the Trustees are barred by equitable considerations from recovering the delinquent pension contributions.

A.   Declaration of Joseph Flores

In its initial decision the district court refused to consider the Declaration of Joseph Flores because it "contradicts Mr. Flores' deposition testimony at several relevant points." The court would not allow the Flores to "create a ... factual dispute through the submission of a self-serving declaration that contradicts prior deposition testimony."

Upon the Flores' motion for reconsideration, however, the district court did consider the Declaration and found it did not contradict any fact material to whether R.C. Tile was the alter ego of R.C. Construction. Rather, the court stated, the Declaration disputed only "minor and immaterial issues of fact" and did not alter the district court's conclusion that the Trustees were entitled to summary judgment.

On review, therefore, this court need not consider the merits of the district court's initial conclusion that the Declaration was a "sham affidavit." The appellants' protestation notwithstanding, at the end of the day the district court simply did not ignore Joseph's Declaration in granting summary judgment to the Trustees.

B.   Alter Ego Liability

The Trustees' claim arises under § 515 of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). 29 U.S.C. § 1145. That provision makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement

> shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plans or such agreement.

Section 515 was a response to the problem created when an employer defaults upon its obligation to fund a multiemployer defined-benefit pension plan: If one employer does not make its contributions to such a plan, then the other participating employers must make larger contributions to cover the shortfall. *See, e.g.*, H.R. REP. No. 96–869 (II) at 15 (1980). The funding burden may be shifted beyond other participating employers to taxpayers *via* the Pension Benefit Guaranty Corporation, and to beneficiaries in the form of reduced pension benefits. *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1328–29 (7th Cir. 1990).

Section 515 "evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose upon other plan participants." *Id.* at 1328. The statute "puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles," *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997); it facilitates recovery of contributions from delinquent employers by limiting the defenses available to an employer in an action brought to enforce the obligation created by § 515.

Alter ego liability under § 515 further protects the federal interest in the solvency of multiemployer pension plans by enabling ERISA trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations. *See Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 305 n.3 (1st Cir. 1998). If R.C. Tile is the alter ego of R.C. Construction, then R.C. Tile is bound by the pension provisions of the CBA and therefore cannot serve to avoid R.C. Construction's obligation to the Fund. *See id.* at 307; *Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir. 1990) (alter ego of

signatory employer "obligated to honor the pension contribution terms of the [CBA]").

In order to determine whether two nominally distinct unincorporated businesses are alter egos for the purpose of assessing liability under § 515, we evaluate the similarities between the two enterprises in their ownership, management, business purpose, operations, equipment, and customers. *See Belmont Concrete*, 139 F.3d at 308 ("No single factor is controlling, and all need not be present to support a finding of alter ego status"). We also look at any transactions or other dealings between the two entities. *See id.**

The evidence is overwhelming that R.C. Construction and R.C. Tile had essentially the same ownership, management, business purpose, operations, and customers. They were in the same line of business (tile laying), in the same industry sector (public works construction), in the same geographic area (southern California). *See id.* at 306. Three members of the Flores family successively owned R.C. Construction (Richard) and R.C. Tile (Jesse, then Priscilla). Under each owner, however, the assets and operations of the company were essentially the same. The assets were transferred among them in non-arms length transactions, which provides a "clear foundation for a holding of 'alter ego' status." *Sloan*, 902 F.2d at 597 (intra-family transfer of assets without consideration a sham; transferee held alter ego under ERISA); *cf. Fugazy Cont'l Corp. v. NLRB*, 725 F.2d 1416, 1419 (D.C. Cir. 1984) (non-arms length transfer of operations "merely a sham, creating a 'disguised continuance' of the predecessor's operations"). In addition, regardless of the changing nominal

---

* Different considerations may be relevant where a corporation is involved. *Compare Greater Kansas City Laborers' Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997), which applied to corporate entities "the alter ego doctrine as developed under corporate law" in order to abide the "long-established principle that a corporation's existence is presumed to be separate and may be disregarded only under narrowly prescribed circumstances," with *Belmont Concrete*, 139 F.3d at 306–08, which applied the above-specified criteria to two corporations without reference to their corporate status.

ownership interest of the various members of the Flores family, Joseph and his wife at all times managed all facets and controlled the finances of the enterprise. *See NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 118 (3d Cir. 1991) (in determining whether employers are alter egos "actual control can be more significant than formal ownership"). On several projects R.C. Tile assumed R.C. Construction's subcontracts and completed work begun by R.C. Construction. R.C. Tile also employed many of the tile-setters who had worked for R.C. Construction.

All these facts indicate R.C. Tile is the alter ego of R.C. Construction and therefore liable for that company's pension obligations as a signatory of the CBA. *See Belmont Concrete*, 139 F.3d at 309. The appellants point to no significant differences between R.C. Construction and R.C. Tile.

The appellants' undocumented assertion that R.C. Tile used different equipment, employees, and accountants than had R.C. Construction and that the two companies obtained different construction contracts does not shake our conviction that they were alter egos. Differences in the contracts and in the employee roster were inevitable because the entities operated successively rather than simultaneously. Such differences as may arise over time following a non-arms length transfer are "not sufficient for a finder of fact to conclude that the businesses are not 'alter egos.'" *Sloan*, 902 F.2d at 598. Even if the appellants could point to evidence in the record to support the asserted differences between the two companies, therefore, those differences would not outweigh the similarities of ownership, management, business purpose, customers, and operations that demonstrate R.C. Tile was the alter ego of R.C. Construction.

The record also shows the Flores themselves treated R.C. Tile as the alter ego of R.C. Construction. In a letter to a general contractor, Priscilla Flores stated, "R.C. Construction is now doing business as R.C. Tile." Faxes from Priscilla to suppliers were signed on behalf of "R.C. Construction/R.C. Tile." Letters and bid notes from Joseph to general contractors identify Joseph's company as "R.C. Construction/R.C.

Tile." The notice of withdrawal from the CBA stated both R.C. Construction and R.C. Tile were withdrawing, even though R.C. Construction was the only signatory.

Nor did the Flores treat the two businesses as distinct entities in transactions between them. *See Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 705 (6th Cir. 1988) (failure to respect formalities in dealings between individual and wholly owned company indicative of alter ego status). The Flores did not observe any of the formalities indicative of separate enterprises; there is no evidence of a written agreement, let alone the payment of any consideration, for either the transfer of assets from R.C. Construction to R.C. Tile or for the transfer of R.C. Tile from Jesse to Priscilla. *See Fugazy*, 725 F.2d at 1419 (lack of formalities surrounding transfer of assets and operations evidence of alter egos). On the contrary, R.C. Construction's assets were used for the benefit of R.C. Tile. Specifically, payments received for work performed on R.C. Construction's contracts went to pay R.C. Tile's bills. After R.C. Construction ceased doing business, Priscilla Flores used R.C. Construction's bank accounts for R.C. Tile's purposes. R.C. Tile borrowed money using R.C. Construction's line of credit. R.C. Tile used R.C. Construction's name to order supplies and to do business with contractors. For R.C. Tile to get the benefits of R.C. Construction's assets and goodwill without taking responsibility for that company's pension liabilities would undermine the policy of the ERISA strictly to bind employers to their pension obligations.

The appellants argue R.C. Construction and R.C. Tile cannot be alter egos because "there was no anti-union animus" behind their closing R.C. Construction and establishing R.C. Tile. We shall assume there was none. As the First Circuit has noted, however, "A finding of anti-union animus is not essential" to hold one entity is the alter ego of another for the purpose of ERISA liability. *Belmont Concrete*, 139 F.3d at 308; *see also NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 580–82 (6th Cir. 1986) (collecting cases holding anti-union animus not required to be alter egos under NLRA); *Greater Kansas City Laborers Pension Fund v. Thummel*, 738 F.2d

926, 930 (8th Cir. 1984); *Fugazy*, 725 F.2d at 1419–20; *J.M. Tanaka Constr. Co. v. NLRB*, 675 F.2d 1029, 1033 (9th Cir. 1982). Anti-union animus may be a reason one entity should be deemed the alter ego of another for the purpose of assigning liability under the ERISA, but the absence of anti-union animus certainly does not establish that two entities are not alter egos.

Therefore, based upon the similarities between R.C. Construction and R.C. Tile with respect to management, ownership, business purpose, operations, and customers, and in light of the principals' complete failure to maintain any meaningful distinction between the two entities, it appears R.C. Construction and R.C. Tile are alter egos.

C. Defenses

Although a favorable balance of the equities is not required to conclude that one entity is the alter ego of another for the purposes of § 515, the appellants present three equitable arguments against holding R.C. Tile liable as the alter ego of R.C. Construction. First, the appellants contend R.C. Tile should not be held the alter ego of R.C. Construction because R.C. Tile received no economic benefit from its failure to contribute to the Fund. According to the appellants, R.C. Tile was required by California law to, and did, pay its non-union employees "prevailing wages (which is the same as union scale wages, including trust fund contributions.)"

Even assuming the truth of that assertion – for which the appellants point to no record evidence – such payments do not absolve R.C. Tile of its obligation to make contributions to the Fund pursuant to the CBA. *See Brogan v. Swanson Painting Co.*, 682 F.2d 807, 809 (9th Cir. 1982); *Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 761 (9th Cir. 1981); *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1310–11 n.8 (D.C. Cir. 1980), *rev'd on other grounds,* 455 U.S. 72 (1982); *cf. O'Hare v. Gen. Marine Transp. Corp.*, 740 F.2d 160, 170 (2d Cir. 1984) (purchase of equivalent health insurance for non-union employees does not excuse failure to contribute to ERISA benefit funds). Nor is the result inequitable. On the contrary, having reaped the benefits of R.C. Construction's as-

sets and goodwill, R.C. Tile should not be able to avoid R.C. Construction's liability to the Fund.

Furthermore, even an employer that receives no economic benefit from avoiding its obligations does harm to the pension fund, which relies upon contributions (and the investment income thereon) from all signatory employers to finance the defined benefits due to beneficiaries. *See Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 & n.4 (3d Cir. 1996); *Mullins*, 642 F.2d at 1310 n.8. Payments made to non-union employees in lieu of contributions to the Fund do nothing to remedy the harm to the Fund from the non-payment of pension contributions due under the CBA.

Second, the appellants argue holding R.C. Tile liable would unjustly enrich the Fund, for which any award of damages would be a windfall. According to the appellants, the Trustees would receive contributions in respect of, but would not incur any obligations to provide pension benefits to, R.C. Tile's non-union employees.

This is nonsense. R.C. Tile's decision to employ non-union labor does not diminish the Fund's defined-benefit obligation to its union beneficiaries. Mirroring that obligation, the Trustees had a clear right under the CBA to receive R.C. Construction's contributions. *See McCormick Dray Line*, 85 F.3d at 1109 ("[T]he welfare fund expected to have those funds at hand for payout of benefits on behalf of other employees, including employees of other employers who are members of the multiemployer welfare fund"). The appellants' argument is also foreclosed by *Mullins*, a case brought by union health and welfare trust funds, in which we stated:

> It is not unfair to [the employer] that it be required to contribute to the . . . funds after having indirectly paid a comparable amount to other workers, for this is exactly what it contracted to do. Neither would enforcing the contract as written create a "windfall" for the Trustees.

642 F.2d at 1310 n.8; *see also Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 636 (D.C. Cir. 1989) (no

defense that contributions required by CBA would, if paid, over-fund pension plan).

Finally, the appellants argue (under the heading of "waiver") the Trustees are barred from recovering unpaid pension contributions because they "waited for more than a year" before notifying R.C. Construction and R.C. Tile of their delinquency. The appellants claim they were prejudiced by the delay because R.C. Tile paid out as wages the monies now claimed by the Trustees for the benefit of the Fund. This argument, which is doubtful as a matter of law, *see McCormick Dray Line*, 85 F.3d at 1108 (two year delay between discovery of delinquency and filing of suit not unreasonable), is utterly foreclosed by the undisputed facts of this case.

After R.C. Construction ceased making payments to the Fund in December 1997, the Trustees "requested an audit of R.C. Construction's books and records, pursuant to ERISA and the [CBA], so that it could be determined whether contributions had been made" in full. Declaration of David Stupar, Executive Director of the Fund, at ¶ 12. The Trustees were still trying to get that information when they filed this suit. Upon these facts we cannot say the Trustees were dilatory in notifying the appellants of their delinquency.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*