# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 7, 2017                    Decided June 15, 2018

No. 16-1303

ISLAND ARCHITECTURAL WOODWORK, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 16-1347, 16-1446

———

On Petitions for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Jeffery A. Meyer* argued the cause and filed the briefs for petitioner Island Architectural Woodwork, Inc.

*Harris Liolis* argued the cause and filed the briefs for petitioner Verde Demountable Partitions, Inc.

*Rebecca J. Johnston*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, General Counsel, *John H. Ferguson*,

Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before: KAVANAUGH, SRINIVASAN and PILLARD, *Circuit Judges*

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

PILLARD, *Circuit Judge*: Petitioner Island Architectural Woodwork, Inc. (Island), a unionized manufacturer of custom modules for office interiors, created Petitioner Verde Demountable Partitions, Inc. (Verde), as a non-union shop to specialize in one of Island's products, a particular type of moveable office divider that Island and Verde called the "Island Verde Green Demountable System" (the Island-Verde Partition). Verde set up shop in Island's back building under the leadership of the daughter of Island's President and CEO. Island conferred substantial, uncompensated economic benefit on Verde through a set of informal agreements. Those agreements were not memorialized in writing for over a year, until after the Union brought unfair labor practice charges; the companies wrote them up only in response to the Board General Counsel's investigatory subpoena. From Verde's start, its employees largely did the same work, on the same equipment, in the same building as Island's unionized workers had done. Island's management, meanwhile, insisted to Island employees that "no union members were allowed to enter the [back] building again." *Island Architectural Woodwork, Inc. & Verde Demountable Partitions, Inc.*, 364 NLRB No. 73, at *3 (Aug. 12, 2016) (alteration in original). Island also conditioned its renewal of its collective bargaining agreement on the Union's signing a waiver of any claim to represent Verde's employees. The Union proceeded to file unfair labor

practice charges before Respondent National Labor Relations Board (NLRB or Board).

The Board held that Petitioners violated Sections 8(a)(1) and (5) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1), (5), when they refused to recognize the Union that represented Island's collective bargaining unit as the representative of Verde's workers, and when they failed to apply the terms of Island's collective bargaining agreement to Verde. Based on evidence showing multiple indicia of a lack of arms-length dealings between Island and Verde, the Board determined that Verde was not a separate and independent employer, but merely Island's alter ego. The Board also held that Island's insistence that the Union renounce any present or future claim to represent workers at Verde violated the Act. Petitioners assert that Verde was a separate business outside of Island's bargaining unit, and they challenge the Board's contrary determination as factually unsupported and based on misapprehensions of the record. Because substantial evidence supports the Board's findings and conclusions, we deny the petitions and grant the Board's cross-application for enforcement.

I.

A.

In reviewing this substantial-evidence challenge to the Board's action, we consider the entire record of the administrative proceedings. In describing the relevant facts we generally draw from the Board's decision, *Island*, 364 NLRB No. 73. We refer to specific record evidence as relevant to Petitioners' challenges.

Founded in 1993, Island produces wood cabinetry and other prefabricated architectural modules for office interiors, particularly for financial institutions. Island's employees, who have been unionized since 1995, are represented by the Northeast Regional Council of Carpenters (the Union). The company gets almost all of its business through a large architecture firm (the Firm). The Firm designs products for customers and then hires Island to manufacture them on a custom basis. The Island-Verde Partition that Island arranged for Verde to build is a moveable, floor-to-ceiling wall that enables businesses to reconfigure their office space.

The Firm designed the Island-Verde Partition and licensed it to Island in 2007. The Firm wanted Island to mass produce the partition, but Island did not believe it could do so cost-effectively. Island's CEO, Edward Rufrano, later testified that he believed Island was lagging behind competitors because they "were outsourcing to either non-Union shops or out of the country." Joint App'x (J.A.) 248. Seeking to remain in the good graces of the Firm—its main source of business—Island tried without success to find a company to buy the license to manufacture the Island-Verde Partition. Rufrano then started talking with a former employee of the Firm about creating a separate entity—Verde—to produce the Island-Verde Partition.

Verde commenced operations as a non-unionized entity in October 2013. At the time, Island owned three buildings adjoining a parking lot: the "main," "back," and "side" buildings. *Island*, 364 NLRB No. 73, at *1. Verde set up shop in the back building and began manufacturing the partitions using Island's equipment. From the outset, Verde was managed by people who had previously worked for Island. For example, Rufrano involved his two daughters, both of whom had worked at Island for years; Tracy D'Agata, who had been

a lead salesperson for the Island-Verde Partition, became Verde's President, with her sister serving as Secretary and Treasurer. An engineer who had designed the partitions for Island also joined Verde, as did a foreman from Island. Rufrano agreed to lend his expertise to the new company. The daughters together owned 64 percent of Verde. The Firm, one of its former employees, and one of Rufrano's acquaintances owned the remaining 36 percent. In addition to the building, Island provided manufacturing equipment and expertise to Verde. Island assisted Verde with management, operations, sales training, back office functions, drafting and engineering, and trucking.

For the production work, Verde hired two former Island employees, in addition to several production employees who had never worked for Island. Island and Verde worked together to produce the partitions. Despite the Firm's wish to transition to mass production, the production process remained "essentially unchanged from the time Island produced the partitions." *Island*, 364 NLRB No. 73, at *3. Island and Verde sent materials and partially finished products back and forth "between the main and back building[s], where each company works on a certain aspect of the process." *Id.* Rufrano held periodic meetings in his office with Verde workers to discuss "[p]roject coordination, materials, labor scheduling, and profitability." *Id.* (quoting Rufrano's testimony) (alteration in original). More than a year after Verde started manufacturing the Island-Verde Partition, Island still marketed it on its own website.

Island and Verde did not at first create documentation of their substantial dealings with each other, and Island made no formal valuations of its assets before handing them off to Verde. Verde did not begin paying Island for the Island-Verde Partition license, rent on the back building, or the leased

equipment until after the NLRB's General Counsel served an investigatory subpoena more than a year after Verde commenced operations, in October 2014. The Asset Purchase Agreement, Equipment Lease, Transitional Services Agreement, Mutual Supply Agreement, Promissory Note, and Officer's Certificate are all dated October 27, 2014—one day before Petitioners responded to the subpoena. J.A. 2 & n.5, 405, 418, 421, 424, 432, 438. The Asset Purchase Agreement and Equipment Lease specified an effective date of October 1, 2013, and additionally included lengthy grace periods and deferred payments enormously beneficial to the new company. J.A. 405, 432. The first time that the parties had any lease or that Verde paid for its use of the back building was June 1, 2014. J.A. 426-31. Eight months of free occupancy saved Verde about $140,000. *Id.* Through informal arrangements and delay, as well as the explicit terms of the agreements when they were ultimately signed, Island conferred on Verde hundreds of thousands of dollars in uncompensated deferrals and savings.

From the outset, Island and the Union disputed the collective bargaining status of Verde's employees. The Union sought to represent the workers at Verde, while Island insisted that Verde was a separate company, not part of Island's collective bargaining unit. The issue became central during negotiations for a new collective bargaining agreement, as the old agreement between Island and the Union expired around the time Verde began operations. During those negotiations, which spanned from October 2013 to March 2014, Rufrano made several misleading statements about Verde to the Union. Rufrano told Union representatives that Verde was a separate business and that he had sold the back building and equipment to his daughter. But, as already noted, Verde was using Island's back building and equipment for free, and there were no lease or sale deposits until June. Rufrano also

deemphasized his role with Verde and the ties between Verde and Island. He asserted that he "was not even going to walk through the courtyard . . . into [Verde's] building," and that "Verde was separate and apart." J.A. 186–87. But Island and Verde collaborated extensively, as later detailed in the Mutual Supply and Transitional Services Agreements. As negotiations progressed, Rufrano acknowledged to the Union his expanded role in Verde.

The parties neared a collective bargaining agreement in January 2014. Negotiations hit a snag, however, when Rufrano insisted that the Union agree to waive any claim to represent workers at Verde. He later presented the Union with a Memorandum of Agreement (MOA) to that effect. J.A. 441. The MOA contained three provisions. First, the Union would agree that the Verde workers were not part of its bargaining unit. Second, the Union would agree that any decision by Island or its leadership to acquire an ownership interest in Verde would not create an alter ego relationship between the two companies. And, third, the Union would waive all existing and future grievances on behalf of Island employees regarding work performed by Verde, including claims under the provisions of the most recent collective bargaining agreement treating employees of any joint venture as part of the bargaining unit, and requiring the Union's consent to subcontract work.

Rufrano "made it very clear" that he would not agree to a new collective bargaining agreement until the Union signed the MOA. J.A. 193 (Testimony of Union President Eustace Eggie). In insisting that the Union sign it, Rufrano sent an e-mail to Union leadership bemoaning the "plight . . . of every union contractor" and stressed his belief that the Union would benefit from Island's increased profits if Verde remained non-

unionized. J.A. 444. The Union refused to agree to the MOA in March 2014, and Rufrano ended negotiations.

## B.

The Union filed unfair labor practice charges on March 6 and April 14, 2014. The NLRB issued an amended, consolidated complaint alleging that Island and Verde violated of Section 8(a)(1) and (5) of the Act. The complaint charged that Verde is Island's alter ego, and that Island and Verde therefore violated the Act by failing to apply the terms of Island's collective bargaining agreement to Verde. The complaint further charged that Island violated the Act by insisting, as a condition of reaching a new collective bargaining agreement, that the Union waive its entitlement to represent workers at Verde.

An administrative law judge held a hearing at which Union President Eustace Eggie, Union Representative Jeffrey Murray, Island machinery operator Paul Horstmann, and Island CEO Edward Rufrano testified. The ALJ found that: (1) Verde operates in the same sphere of business as Island; (2) Verde is located in a facility and uses machinery that was previously part of Island's operations; (3) Island performs significant services for Verde; (4) at least two of Verde's owners are the daughters of the principal owner and CEO of Island; and (5) the business being done by Verde—producing wooden partitions—is work that was at one point done by Island. *Island Architectural Woodwork, Inc. & Verde Demountable Partitions, Inc.*, 2015 WL 2156772 (NLRB May 8, 2015). The ALJ concluded, however, that Verde was not Island's alter ego. The ALJ highlighted the lack of common ownership, as well as some evidence showing that Island did not exercise control over Verde's operations. *Id.* at \*6. The ALJ further concluded that, because Verde is not Island's alter ego, Island did not

violate the Act by insisting that the Union agree to the MOA excluding the Union from Verde as a condition of reaching a new collective bargaining agreement governing Island's collective bargaining unit. *Id.* at \*9.

The Board reversed. Sustaining the ALJ's findings that Island and Verde have substantially identical business purposes and operations, the Board also found that the extensive financial control Island exerted over Verde, together with evidence of anti-union animus, supported an alter ego finding. The Board also held that Island violated the Act by insisting that the Union waive its right to represent workers at the Verde facility. The Board then ordered Island and Verde to cease and desist from refusing to recognize the Union as the exclusive collective bargaining representative of employees at both Island and Verde, and from conditioning a new collective bargaining agreement on the Union's acceptance of the MOA. *Island*, 364 NLRB No. 73, at \*5–10. These petitions for review followed.

## II.

### A.

Our review of the Board's decision is "limited." *Enter. Leasing Co. v. Nat'l Labor Relations Bd.*, 831 F.3d 534, 542 (D.C. Cir. 2016) (quoting *Stephens Media, LLC v. Nat'l Labor Relations Bd.*, 677 F.3d 1241, 1250 (D.C. Cir. 2012)). The parties do not disagree on the governing law; they dispute whether substantial evidence supports the Board's determination that Verde is Island's alter ego. Whether the businesses are separate entities "is a question of fact to be properly resolved by the Board." *Southport Petroleum Co. v. Nat'l Labor Relations Bd.*, 315 U.S. 100, 106 (1942). The Act provides that the Board's factual findings are "conclusive"

where they are supported by substantial evidence. 29 U.S.C. § 160(e). The substantial evidence standard requires "a very high degree of deference." *Bally's Park Place, Inc. v. Nat'l Labor Relations Bd.*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quoting *United Steelworkers of Am. v. Nat'l Labor Relations Bd.*, 983 F.2d 240, 244 (D.C. Cir. 1993)). Indeed, "[i]t is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions." *Id.* (quoting *United Steelworkers of Am.*, 983 F.2d at 244). Rather, "[t]he Board is to be reversed only when the record is 'so compelling that no reasonable factfinder could fail to find to the contrary.'" *United Steelworkers of Am.*, 983 F.2d at 244 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

Even "[w]here the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change." *Kiewit Power Constructors Co. v. Nat'l Labor Relations Bd.*, 652 F.3d 22, 25 (D.C. Cir. 2011) (quoting *Local 702, Int'l Bhd. of Elec. Workers v. Nat'l Labor Relations Bd.*, 215 F.3d 11, 15 (D.C. Cir. 2000)) (alteration in original); *see also Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 496 (1951). As our dissenting colleague acknowledges, Dissent at 1, the substantive law governing the alter ego inquiry is not disputed. Where the record supports the Board's view of the evidence— even if it might also support the ALJ's contrary view—we must defer to the Board. After all, "since the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of [the] result, and is free to substitute its judgment for the [ALJ's]." *Kiewit*, 652 F.3d at 26 (quoting *Local 702, Int'l Bhd. of Elec. Workers*, 215 F.3d at 15) (alterations in original).

11

B.

The Board's alter ego doctrine holds an employer responsible for the contractual or statutory obligations of a nominally separate employer where the circumstances show the latter is not actually distinct, but operates as the "alter ego" of the first in a "disguised continuance of the predecessor's operations." *Fugazy Cont'l Corp. v. NLRB*, 725 F.2d 1416, 1419 (D.C. Cir. 1984). The Board considers a range of facts as relevant to the alter ego question, including "substantial identity of management, business purpose, operation, equipment, customers, supervision, and ownership" between the two entities. *Id.*; *see J. Westrum Electric*, 365 NLRB No. 151, at *5 (Dec. 13, 2017). The Board gives "substantial weight" to evidence of a company's motive to evade its obligations under the NLRA, *Fugazy*, 725 F.2d at 1419, but no single factor is dispositive, and not every factor need be present in a particular case to establish alter ego status. *See id*. at 1419-20.

The alter ego test is contextual and requires the Board to consider the circumstances of each case. An alter ego relationship may operate, for example, where one entity completely shuts down and is replaced by another, *see A.D. Conner, Inc.*, 357 NLRB 1770 (2011), or where one entity continues to operate but spins off a portion of its unionized operations to a non-union entity, *see El Vocero de Puerto Rico, Inc.*, 357 NLRB 1585 (2011). Our case law is to the same effect. *See Flynn v. R.C. Tile*, 353 F.3d 953 (D.C. Cir. 2004) (affirming alter ego finding in the ERISA context where owners shut down unionized company and quickly opened new, nonunionized counterpart); *Fugazy*, 725 F.2d at 1418 (affirming alter ego finding where only portion of company's operations were shut and transferred to a new, "sham" company established to perform the same work).

In *Fugazy*, for example, immediately after workers at the repair shop of a limousine company voted to unionize, the company shut down and sold the repair business to two of its supervisory employees, who promptly re-opened it with new, nonunionized workers. *Id.* The repair shop was nominally distinct from the limousine company, under separate ownership, but almost all of its business consisted of work for the limousine company, *id.* at 1420, which assumed responsibility for the repair shop's utility bills, secretaries, security, and bill collectors, *id.* Moreover, no written agreement documenting the sale was prepared until after unfair labor practice proceedings commenced before the Board. *Id.* at 1419. The Board found that the new shop amounted to a "continuation of the same business, in the same location, with the same supervisors, for the benefit of the same party." *Id.* at 1419-20 (internal quotation marks omitted).

On those facts, the Board held that the auto repair shop was the limousine company's alter ego, established in an attempt to evade collective bargaining obligations. *Id.* at 1418 (citing *Fugazy Continental Corp.*, 265 NLRB No. 165, at \*4-5 (1982)). Our colleague emphasizes the lack of common ownership of Island and Verde, Dissent at 3, but we sustained the Board's finding in *Fugazy* even though the limousine business and the repair shop were separately owned. *Id.* In so doing, we noted "the presence . . . of many additional factors," such as anti-union animus and the lack of formal documentation, and specified that "common ownership is *not* an absolute prerequisite to a finding of alter ego status." *Id.* at 1420 (emphasis in original) (citing *J.M. Tanaka Constr., Inc. v. NLRB*, 675 F.2d 1029, 1035 (9th Cir. 1982) ("Common ownership, however, is but one, and not always an important factor to be considered in determining the existence of an alter ego relationship.")).

C.

Turning to our review of the Board's decision, we conclude that the Board's findings on three critical factors—identity of business purpose, operations, and equipment; substantial control; and anti-union motive—are supported by substantial evidence and comport with the alter ego doctrine under our case law.

1.

The Board first found that Island and Verde had substantially identical business purposes and operations. As to purpose, we have observed in the context of alter ego liability for collectively-bargained pension benefits that nominally distinct entities share a "business purpose" if they are in "the same line of business." *Flynn*, 353 F.3d at 959. The two entities need not be engaged in the same business contemporaneously for liability to run; they may be alter egos where there is a continuity of business purpose from one to the other, and operations remain "essentially the same" after the putative spin-off. *Id.* This is particularly so where the two companies remain closely intertwined after transfer or sale of operations to an entity asserted to be distinct. *Fugazy*, 725 F.2d at 1419-20.

In this case, the Board found that Island created Verde to manufacture the Island-Verde Partition that Island had been exclusively producing for the Firm. *Island Architectural Woodwork*, 364 NLRB No. 73, at *6. Substantial record evidence supports that finding. Indeed, the Board's narrative of events largely mirrors the testimony of Island's CEO, Edward Rufrano. Rufrano testified that the partitions had been unprofitable and he said he created Verde in an effort to produce them in a more cost-effective manner. J.A. 240-46.

Rufrano involved his daughters in establishing the new entity. J.A. 247. Island then sold the Island Verde Green Demountable System product license to this eponymous new entity, which began producing the Island-Verde Partitions on Island's property using the same equipment that Island had used to manufacture them, but without unionized workers. J.A. 242-43, 255.

Petitioners claim to dispute whether Verde was created to manufacture the Island-Verde Partition, but fail to identify evidence that contravenes the substantial record evidence supporting the Board's finding. The Board found that Island and Verde's operations were substantially identical: "[L]ittle of the wood partition work [had] changed with the advent of Verde." *Island*, 364 NLRB No. 73, at *6. According to the testimony of Union Representative Jeffrey Murray, Verde employees performed the same work on the same equipment that Island employees had previously performed. J.A. 87-88. Petitioners identify no evidence to contradict this testimony. The Board also found that the two companies collaborated extensively on their operations. *Island*, 364 NLRB No. 73, at *6. Island and Verde agreed to work together on a number of activities including management, product design, and office functions. J.A. 424 (Mutual Supply Agreement). Rufrano testified that he frequently held meetings in his office with Verde personnel to discuss "project coordination, materials, labor, scheduling, and profitability." J.A. 325; *see* J.A. 149-50 (Testimony of Island Machinery Operator Paul Horstmann). Island even marketed the Island-Verde Partition on its own website. J.A. 445 (Screenshot of Island Website). The MOA, moreover, speaks to joint ownership by purporting to contract around any effect of Island's principals' ownership or management interest in Verde. *See* J.A. 441.

Petitioners seek to characterize their close ties as those of a typical vendor-vendee relationship. But the Board permissibly found otherwise. The facts, as discussed above, show that Verde picked up where Island left off—manufacturing the Island-Verde Partition for the same customer with the same equipment in the same place in the same way with many of the same employees and managers. That evidence supports the Board's finding that Verde was a disguised continuance of the Island-Verde Partition business and therefore Island's alter ego.

Petitioners emphasize that Verde only produced a small number of the wooden Island-Verde Partitions. Verde soon turned its focus to metal and glass partitions—items that Island itself had never produced—as the wooden versions were not as profitable as anticipated. These facts, however, are consistent with the Board's alter ego finding, which rested in part on the similarity of operations at Verde's inception. *Island*, 364 NLRB No. 73, at *6; *see* J.A. 261-63 (Rufrano's testimony about the product evolution).

2.

The Board next found that Island maintained substantial control over Verde. *Island*, 364 NLRB No. 73, at *7. Evidence of continuing control, too, tends to show that a spin-off is not genuine, but is instead an effort by the controlling business to continue to operate while evading legal responsibilities. Common ownership between the two entities is generally a significant factor supporting a finding of substantial control, as our dissenting colleague stresses, Dissent at 3, but we have explained that common ownership "is *not* an absolute prerequisite to a finding of alter ego status." *Fugazy*, 725 F.2d at 1420 (citing *J.M. Tanaka*, 675 F.2d at 1035) (emphasis in original). Instead, substantial control can be evinced by other

indicia of a lack of an arms-length sale.  In both *Fugazy* and *R.C. Tile*, for example, we upheld alter ego findings where the companies under scrutiny failed to formally document substantial transactions with their alleged alter egos—a risky business step not ordinarily taken by genuinely separate and independent entities that tends to suggest continuing control. *See R.C. Tile*, 353 F.3d at 960; *Fugazy*, 725 F.2d at 1420.

The record here contains ample evidence that Island retained substantial control over Verde.  Island's CEO Rufrano testified that he thought the Island-Verde Partition had "tremendous" potential.  J.A. 262.  He characterized the Island-Verde Partition as a crucial piece of Island's relationship with the Firm, and cast that relationship as "[e]ssential" to Island's continued existence.  J.A. 241.  Nonetheless, Island sold the product without paperwork documenting the sale and apparently without receiving anything in return.  Like the limousine business in *Fugazy*, Island created formal documentation of its putative sale of part of its business only after the companies faced unfair labor practice charges.  *See* J.A. 405 (Asset Purchase Agreement).  It strains credulity that Island would engage in a transaction it cast as so consequential to its future survival with virtually none of the usual formal business documentation—unless it in fact retained significant control over Verde.

What is more, as detailed above, Verde operated in Island's back lot, used Island's equipment, and received significant operational assistance from Island without Island documenting or demanding payments for those valuable contributions. The key documents, once written up—including the Asset Purchase Agreement, the Equipment Lease, Rental Lease, Transitional Services Agreement, Mutual Supply Agreement, and Officer's Certificate—were all dated after the Union filed unfair-labor-practice charges.  J.A. 421, 424, 432,

438. All contained generous grace periods and deferred payments. *Id.*

Petitioners contend that they delayed drafting and executing the agreements until they were sure that they could profit from the Island-Verde Partition. Even if there were evidence to support it, that argument makes little sense: The riskier Verde's undertaking, the more formal contract terms Island reasonably should have demanded for the resources it sunk into the project. Although sometimes the "extremely suspicious . . . informality" of such transactions has an innocent explanation, *Fugazy*, 725 F.2d at 1420, the Board's finding to the contrary here is supported by substantial evidence in the record.

The Board also found probative that both companies were owned by members of the same family. *Island*, 364 NLRB No. 73, at *7. Board precedent has found an alter ego relationship in such circumstances even in the absence of common ownership. *See, e.g.*, *El Vocero*, 357 NLRB at 1585 n.3. There is no dispute that Rufrano's daughters have a controlling stake in Verde. Petitioners point out that familial relationships do not alone establish the alter ego relationship, but, as recounted above, the Board had substantial additional grounds for its alter ego determination.

Rufrano's statements and actions, moreover, suggest that he exerted *de facto* control over Verde's operations. During negotiations with the Union, Rufrano was intent on ensuring that Verde remained non-unionized. He sought even to prevent future representation of Verde's workers, come what may between Island and Verde. Rufrano also told the Union that if it waived all claim to represent Verde's employees, Verde would sign "exclusive agreements" to steer incidental work on the partitions to Island. *Island*, 364 NLRB No. 73, at *7-8; *see*

*also* J.A. 187-88 (Testimony of Union President Eustace Eggie); J.A. 444 (Email from Edward Rufrano to Union). The Board had ample support for its conclusion that Rufrano would have been unable to make such a guarantee if he did not exert significant control over Verde's operations.

Island's continued connection to Verde, like the "umbilical relationship" of the limousine and the repair businesses in *Fugazy*, 725 F.2d at 1420, and the only "nominally distinct" tile companies in *R.C. Tile*, 353 F.3d at 958, was characterized by informalities and extensively intertwined operations and management, all under Island's *de facto* control, that supported an alter ego finding.

3.

A third factor supporting the Board's alter ego holding was its finding that Island created Verde for the purpose of evading its bargaining obligations under the Act. *Island*, 364 NLRB No. 73, at *8. The Board considered Rufrano's own statements and actions. During his testimony before the ALJ, Rufrano said at several points that it was because Island was unionized that it could not profit off of the Island-Verde Partition. *See* J.A. 248 ("We just couldn't compete in the marketplace. Our competitors were outsourcing to either non-Union shops or out of the country and we just couldn't compete."); J.A. 339 ("[T]he way we were as a custom shop we could not compete any longer. And most . . . of my competition is non-Union. We're one of the last Union shops. Even the large Union shops outsource to non-Union vendors."). Moreover, Rufrano bemoaned the "plight . . . of every union contractor" and attempted to persuade the Union that its workers would benefit from increased profits for Island if Verde, a business ally, were non-unionized. J.A. 444 (E-mail from Edward Rufrano to Union).

Rufrano also repeatedly misled the Union about Island's relationship to Verde, and his evasiveness and conflicting accounts to the Union support the Board's finding of his anti-union purpose in creating Verde. Evidence shows, first, that Rufrano said he had sold the back building and the equipment therein to his daughter. J.A. 47-49 (Testimony of Union Representative Jeffrey Murray). But no such sale had occurred; Verde was using the building and the equipment for free. Rufrano then told the Union that "there was no relationship" between the two companies, J.A. 49 (Testimony of Jeffrey Murray), despite the extensive collaboration between them as later manifested in, among other things, the Mutual Supply Agreement, J.A. 424-27 (Mutual Supply Agreement). Testimony also revealed that Rufrano told the Union that he would have neither a role nor any financial interest in Verde. J.A. 186-87, 211-12 (Testimony of Eustace Eggie). But, during negotiations with the Union over a successor collective bargaining agreement, he said that "his position with Verde had changed." JA 211 (Testimony of Eustace Eggie). Rufrano then pressured the Union to agree that Island's acquisition of any ownership interest in Verde "shall not create a joint employment or alter ego relationship." JA 441 (Memorandum of Agreement). These misleading and shifting explanations support the Board's finding that Verde's creation was motivated by a desire to circumvent the requirements of the Act. *Island*, 364 NLRB No. 73, at *8-9.

Petitioners' arguments are at odds with Rufrano's own testimony and, in view of the substantial record evidence, do not detract from the Board's findings. Petitioners assert, for example, that Island's efforts to sell the Island-Verde Partition line to another company before setting up Verde belie any finding of anti-union motivation, as they reveal that Rufrano was actually motivated by his desire to preserve Island's

relationship with the Firm. But those dual motives are hardly mutually exclusive. Indeed, Petitioners' argument fails to rebut the substantial evidence in the record that Rufrano sought to preserve that relationship through unlawful means: by establishing a non-unionized alter ego to produce the Island-Verde Partition line in contravention of Island's obligations to its workers. J.A. 236, 240-41, 248 (Testimony of Edward Rufrano); J.A. 444 (E-mail from Edward Rufrano to Union).

Petitioners also argue, without evidentiary support, that Verde was established so that Rufrano's daughters could get a foothold in the industry. But Rufrano testified to the contrary: The idea to create a separate entity for the Island-Verde Partition came from a former employee of the Firm so that the employee could "get involved and manufacture the product." J.A. 247. Rufrano referred to his daughter as the one with established footing, as a result of her "almost 20 years" of experience with Island. J.A. 247.

Finally, Petitioners contend that an anti-union motive could not have played a role in establishing Verde because Island lacks a financial stake in Verde and thus lacked any interest in whether Verde unionized. But the record shows that Rufrano explicitly contemplated a future financial benefit to Island from a non-unionized Verde; as he stressed during union negotiations, the two companies worked together on producing and marketing the partitions. J.A. 240-41, 325 (Testimony of Edward Rufrano); J.A. 444 (E-mail from Edward Rufrano to Union). The Memorandum of Agreement, moreover, specifically referenced Island principals' management or ownership interests in Verde. J.A. 441 (MOA).

21

D.

Finally, we turn to Petitioners' contention that the Board lacked substantial evidence for its holding that Island violated the Act by insisting, as a condition of reaching a new collective bargaining agreement, that the Union renounce any claim to represent Verde's employees.  Petitioners concede, as they must, that during negotiations over a new collective bargaining agreement, Island urged the Union to accept Island's proposed Memorandum of Agreement.  *See* J.A. 441 (MOA).  Petitioners argue only that Island did not make the MOA a sticking point during the collective bargaining agreement negotiations, but the Board found that they lack support in the record for that characterization.

The Union charged that Island violated the Act by insisting on agreement regarding "permissive" subjects of collective bargaining as a condition of reaching any agreement on "mandatory" subjects.  *See Island*, 364 NLRB No. 73, at *9-10; J.A. 352, ¶¶ 16-19 (Board Complaint).  Section 8(d) of the NLRA requires representatives of employers and employees "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."  29 U.S.C. § 158(d).  Those issues, because they "settle an aspect of the relationship between the employer and employees," are "mandatory" subjects of bargaining.  *Int'l Longshore & Warehouse Union v. NLRB*, No. 15-1336, slip. op. 14 (D.C. Cir. May 29, 2018) (quoting *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 675 (1981)).  Parties have no obligation to bargain, however, over "permissive" subjects of bargaining.  *See Aggregate Indus. v. Nat'l Labor Relations Bd.*, 824 F.3d 1095, 1099 & n.4 (D.C. Cir. 2016).  Transferring work between bargaining units is a mandatory subject of bargaining, while a proposal to change the scope of a bargaining unit is a permissive bargaining subject.  *Id.* at 1099-

1100. If bargaining reaches impasse or the union refuses to bargain, an employer may unilaterally make the change on a mandatory subject, but "has no choice but to maintain the status quo" on a permissive subject; indeed, "[a] unilateral change to a permissive subject of bargaining is illegal." *Id*. at 1099.

A party violates its obligation to bargain in good faith if it conditions agreement regarding mandatory subjects on acceptance of a particular position on a permissive subject. *Nat'l Labor Relations Bd. v. Wooster Div. of Borg-Warner*, 356 U.S. 342, 349 (1958). Doing so amounts to an unlawful refusal to bargain about subjects within the scope of mandatory bargaining. *Id*. A party may, however, advance a proposal on a permissive subject so long as it does not insist on a particular resolution as a price for overall agreement. *Id.*; *see U.S. Dep't of Interior v. Fed. Labor Relations Auth.*, 23 F.3d 518, 521 (D.C. Cir. 1994).

The parties do not dispute that negotiations for the successor collective bargaining agreement involved mandatory subjects of bargaining, and that the MOA contained permissive subjects. The MOA would have required the Union to renounce any claim to represent Verde's employees and to agree that any decision by Island, its CEO, or Vice President to acquire an ownership interest in Verde would not establish an alter ego relationship. J.A. 441. The draft MOA declared that Verde's employees were not currently within the bargaining unit, and that, going forward, "any ownership interest in or management of Verde by any principal of [Island] . . . shall not create a joint employment or alter ego relationship or otherwise constitute an accretion under the expired collective bargaining agreement." J.A. 441. The MOA also would have waived any grievances by Island's employees regarding work performed by Verde, notwithstanding CBA clauses restricting subcontracting and joint ventures. J.A. 441.

The Board's finding that Petitioners insisted that the Union acquiesce on permissive subjects as a condition of reaching a successor collective bargaining agreement is supported by substantial evidence. The Board credited the testimony of Union officials that Island conditioned any new agreement on acceptance of the MOA. *Island*, 364 NLRB No. 73, at *9-10; *see, e.g.*, J.A. 193 (Testimony of Eustace Eggie) ("Ed [Rufrano] made it very clear that before . . . he would sign a new [collective bargaining] agreement, that . . . I would have to have [the MOA] signed by the union."); J.A. 51-52 (Testimony of Jeffrey Murray) ("Mr. Rufrano said to me that . . . I have to have in the agreement that you guys waive any claim to the back building . . . a complete waive[r] to any claim to the work, to any claim to its business, so on and so forth . . . . I have to have this before I can agree to anything."). Petitioners failed to offer evidence that would require a finding contrary to the determination of the Board. We therefore cannot disturb the Board's order here.

\* \* \*

For the foregoing reasons, we deny Island and Verde's petitions for review and grant the Board's cross-application for enforcement.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: Under the National Labor Relations Act, an "employer" must bargain with the union that represents its employees. 29 U.S.C. § 158(a). This case involves two small businesses on Long Island named Island and Verde. Both companies made partitions for offices. The first company (Island) had a collective bargaining agreement with a union that represented its employees. The second company (Verde) did not have a collective bargaining agreement. But the Board treated the two companies – Island and Verde – as one "employer" and ruled that Verde therefore had to afford Verde's employees the same rights that Island's employees had under Island's collective bargaining agreement.

The Board treated Island and Verde as a single employer on the theory that Island and Verde were alter egos. The majority opinion upholds that conclusion. I respectfully dissent.

The relevant legal principles are not in dispute: "Among the factors that enter into a determination of alter ego status are substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the old entity and its successor." *Fugazy Continental Corp. v. NLRB*, 725 F.2d 1416, 1419 (D.C. Cir. 1984). We have added that common ownership in particular "weighs heavily in the alter ego determination." *Douglas Foods Corp. v. NRLB*, 251 F.3d 1056, 1063 (D.C. Cir. 2001).

Applying those principles here is not hard, as I see it. Island and Verde did not have common ownership. They did not have common management. They did not share employees. They did not mingle funds. Neither company had a financial interest in the other. Each company supervised, hired, fired, and paid the salaries of its own employees.

The administrative law judge who heard the testimony in this case ruled that the companies were *not* alter egos. The ALJ reached the following factual conclusions, which are worth quoting at length:

> [T]he owners of Verde are not the same people who own Island[,] and Verde's ownership includes individuals and businesses that have no familial relationship with Island's owners. In addition, the evidence shows that Island's management does not exercise control over Verde's business operations; that Verde, and not Island, supervises, hires, fires and controls the labor relations of its own employees; that there is no interchange of production employees between the two companies; and that with two exceptions, Verde's production employees were not employed by Island contemporaneously with when Verde commenced its operations. Finally, the evidence shows that when Verde was created and commenced operations, this transaction had virtually no adverse [e]ffect on Island's bargaining unit employees who, despite the expiration of the existing contract, continued to be paid and receive benefits in accordance with the agreement between Island and the Union to continue the collective bargaining agreement. No bargaining Island unit employees were laid off and those who chose to remain employed by Island did not have their pay or existing benefits reduced.

*Island Architectural Woodwork, Inc. and Verde Demountable Partitions, Inc.*, 364 NLRB No. 73, Slip Op. 13-14 (Decision of Administrative Law Judge) (May 8, 2015). The ALJ further explained that the creation of Verde "has not resulted in any harm to the existing complement of Island's bargaining unit employees. In my opinion, this mitigates against any

conclusion that Island had the intent to evade its contractual obligations to its existing complement of employees who were represented by the Union." *Id*. at 12.

In light of the factual record, the ALJ concluded that Island and Verde were not alter egos. In my view, the ALJ's conclusion was the only reasonable conclusion to reach on this factual record.

The Board nonetheless reversed the ALJ. But the Board's analysis is wholly unpersuasive. To be sure, as the Board noted, Island and Verde made similar products, and Verde operated in a facility that used to be part of Island's operations. The Board also seems to have found something shady in the fact that Verde was started and primarily owned by two daughters of Island's primary owner. But those facts do not remotely support a finding of alter ego status given that the two companies, among other indicia of their separateness, did not have common ownership or common management.

In upholding the Board's decision, the majority opinion relies heavily on our decision in *Fugazy*. But in that case, we made clear that the one company "retained a substantial financial interest" in the other company's "operations." *Fugazy*, 725 F.2d at 1420. Here, by contrast, Island did not maintain a substantial financial interest in Verde – or vice versa. Moreover, in *Fugazy* one company shut down and then re-emerged as a "new" company. *See id*. at 1418. That is a far cry from what happened with Island and Verde, which maintained separate operations with separate ownership and separate management. *Fugazy* does not support the result reached by the majority opinion in this case.

In light of the relevant law and facts, the Board's conclusion that Island and Verde were alter egos is not

reasonable.  I would therefore vacate the Board's decision.  I respectfully dissent.